Filed 11/17/25  T.J. v. Superior Court CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| T. J.,<br><br>    Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF CONTRA COSTA COUNTY,<br><br>    Respondent;<br><br>CONTRA COSTA COUNTY CHILDREN & FAMILY SERVICES BUREAU,<br><br>    Real Party in Interest. | A174042<br><br>(Contra Costa County Super. Ct. Nos. J2400437, J2400438, J2400439, J2400440) |

T.J. (Mother) petitions this court for an extraordinary writ after the juvenile court terminated reunification services and set a hearing pursuant to Welfare and Institutions Code section 366.26 for her four minor children.[1] (Cal. Rules of Court, rule 8.452.)  She contends the trial court erred in setting the hearing because she had made progress with her court-ordered

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

1

reunification plan and because there was a substantial probability the children could be returned to her care. We deny the petition on the merits.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Detention, Jurisdiction, and Disposition*

Contra Costa County Children & Family Services (the Bureau) filed four petitions pursuant to section 300 on August 6, 2024—one for each of the four children, 14-year-old T.1, 12-year-old T.2, eight-year-old T.3., and two-year-old M.S. As later amended and sustained, the complaints alleged Mother had not provided adequate protection from domestic violence between herself and M.S.'s father (Father);[2] that an earlier dependency case had recently been closed with a safety plan to protect Mother and the children, but Mother did not follow through with the safety plan; and that Mother and Father had violated an active restraining order protecting Mother (§ 300, subd. (b)(1)); as to T.1, T.2, and T.3, that Mother had placed the children at risk of physical harm by engaging in acts of domestic violence with Father in the presence of the children (§ 300, subd. (b)(1)); as to T.2, that Mother asked her to intervene in a violent argument by barricading her bedroom door then jumping out of the window, and that T.2 felt unsafe at home because of domestic violence between Mother and Father (§ 300, subd. (c)); and as to M.S., that Father had placed her at substantial risk of harm and neglect by engaging in acts of domestic violence in her presence. (§ 300, subd. (b)(1).)

The children were placed in the home of a maternal aunt (Aunt), where they remained throughout these proceedings.

---

[2] Although T.1, T.2, and T.3 have a different father than M.S., for the sake of simplicity we refer to M.S.'s father as "Father." The father of the three older children is deceased.

2

The detention/jurisdiction report explained that the Bureau received information on July 29, 2024 that Mother and Father had been involved in an argument, during which they hit each other. Mother ran into T.2's bedroom and asked her to barricade the door, Father " 'busted through' the door" as T.2 tried to do so, and Mother jumped out of the second story window, breaking both her ankles and fracturing her spine. It appears that T.2, T.3, and M.S. were in the home at the time. Mother was taken to a hospital, and she would need surgery followed by placement in a rehabilitation facility.

The older children, T.1, T.2, and T.3, reported other incidents in which they saw Father being physically abusive to Mother, including a recent incident when Father " 'sock[ed]' " Mother in the face. On another occasion, T.2 saw Father push Mother down and hit her, causing her to bleed from the face, and break items in the home; another time, T.2 came home and found the front door broken. These incidents occurred mainly at night.

Mother denied any recent domestic violence with Father. Mother denied that Father lived in the family's home, but Father said he stayed there more than half the time.

Mother had a history of child welfare referrals dating to 2008. As to the referrals that had been substantiated, in July 2022, she was "foaming at the mouth" and appeared to be under the influence of methamphetamines and amphetamines while holding then two-month-old M.S. An investigation indicated that Mother and Father had been engaging in domestic violence and Father had sent threatening text messages. After this incident, the children were detained and the family received reunification and maintenance services, including domestic violence services and development of a domestic violence relapse plan. That dependency was vacated on April

3

17, 2024, less than four months before the incident giving rise to the current dependency.

A report before the jurisdictional and dispositional hearing detailed an additional incident of prior domestic violence, shortly after M.S. was born, in which Mother and Father engaged in a physical altercation in the stairwell of an apartment building while Mother was holding her four-week-old infant. She fell to the bottom of the stairs with the baby still in her arms. During the incident, Father struck Mother multiple times and strangled her. Mother obtained a restraining order against Father, which was still in effect when Mother and Father engaged in the fight that ended with her jumping out a window. Nevertheless, during the time the protective order was in place, Father often spent the night at the family's home.

Father had a history of arrests from June 2008 to May 2022, including arrests for assault with a firearm, violation of parole, criminal threats, inflicting corporal injury on a spouse or cohabitant, child abuse with possible great bodily injury, cruelty to a child, and battery.

On November 13, 2024, the juvenile court sustained the petition as amended, adjudged the children dependents, and ordered reunification services.

### Six-Month Review Report

The six-month review hearing was initially scheduled for April 30, 2025. The Bureau's report indicated that Mother had taken a five-week domestic violence prevention class, and the class facilitator reported that Mother participated in it actively. She was also participating in a domestic violence survivors' support group, and the facilitator reported that she was very engaged in the discussions. Mother said she had been attending therapy, but the social worker could not confirm this information. She had

attended only three of nine sessions of one parenting class, but she was participating in another parenting class.

Mother had attended only 12 of 21 possible visits with the children during the period from November 15, 2024 to April 16, 2025, many of the missed visits being due to Mother not confirming she would attend or cancelling shortly before the visit. The three older children had expressed indifference about the missed visits. During visits, M.S. often played on her own while Mother tried to interact with the older children.

T.1 and T.2 had seen pictures of Mother and Father together and text messages from Father on Mother's phone. They expressed their fears about returning to Mother's care. T.2 had spoken about Mother being verbally and physically abusive toward the children, about not having food in the home, and about being tardy or absent from school while she was in Mother's care. T.1 said she did not think she could have stability and consistency in her life if she returned to Mother's care, and she was angry at Mother and distrustful about Mother's relationship with Father.

Two of Mother's family members told the social worker they saw Father at Mother's home on the afternoon of January 30, 2025, despite the existence of a restraining order.

The Bureau recommended terminating family reunification services and setting a hearing pursuant to section 366.26. On the scheduled date of the review hearing, Mother and Father requested a contested hearing, which ultimately took place on August 7, 2025.[3]

***Additional Reports Before Six-Month Hearing***

A report dated June 9, 2025, explained that since the last hearing, Mother had attended only three of seven possible visits with the children,

---

[3] Father is not a party to this writ proceeding.

5

and she ended one visit an hour early.  During that visit, Mother asked T.1 repeatedly whether T.1 needed a new swimsuit for class, and Mother became defensive and "mutter[ed] under her breath about the attitude."  T.1 was upset after the visit and told the social worker she would like to attend fewer visits because Mother had "mood swings" and T.1 "never [knew] if she'll be upset or not."  Both T.1 and T.2 expressed their view that Mother's behavior was " 'very odd, very confusing . . . why it turned so argumentative.' "  The caregiver reported that Mother called the children only infrequently.

The Bureau had learned that some of the information Mother provided about her therapy was not true.  Mother had said she began seeing her therapist in September 2024, and in April 2025 she told the social worker she had switched to a new therapist because of a problem with her insurance.  But the social worker later learned that Mother's intake interview for the initial therapist did not take place until December 2024 and that her services were discontinued in April 2025 because of poor attendance—that is, she had attended only 11 out of 18 sessions.

An August 4, 2025 memorandum to the juvenile court explained that Mother had again switched to a new therapist, and she reported being happy with him.  Her attendance at visits had recently improved, but she still had attended only 60 percent of the visits available to her.  One missed visit was attributable to her decision to go to Las Vegas to celebrate her birthday and that of an adult daughter who lived there.  Mother sent pictures of the Las Vegas trip to T.1, which caused T.1 to feel left out.  T.1 and T.2 were "unwavering" in their wish to remain in Aunt's care, and T.3 had also spoken about wanting to remain in the foster home, despite his love for mother.

### *Contested Six-Month Review Hearing*

At the contested hearing, Mother introduced evidence that she had completed a 12-hour parenting course in April and May 2025 and two domestic violence programs between May and July 2025, one five hours and one four hours. However, the social worker assigned to the case testified that he had told Mother that the domestic violence programs did not satisfy the need for a 26-week comprehensive domestic violence victim program that included safety planning and prevention. Such a program was necessary because of the severity of the family's domestic violence and the fact that the previous dependency had ended only four months before the current dependency case began. Mother had been attending weekly sessions with a domestic violence counselor since June, and they had been working on a safety plan.

Mother had engaged in some individual therapy and had expressed a desire for family therapy. A family therapist had been assigned. Mother had had one individual session with him, but family therapy had not yet begun.

Mother had recently told the social worker she would be moving to a different city and would no longer be living in the home to which Father had access.

In December, Mother had still been in a wheelchair and having problems with her mobility because of the fall from the window. She had to take a bus to some of the visits, which she told the social worker made it difficult for her to get around.

The juvenile court terminated reunification services for both parents and set a hearing pursuant to section 366.26, finding that neither parent had participated regularly and made substantive progress in their case plan. As to Mother, the court explained its reasoning as follows: The present

dependency began only shorty after an earlier proceeding, which also involved acts of violence by Father against Mother, had ended.  Mother had made some efforts during the dependency—particularly taking into account her injuries—but her participation had been less than adequate.  She had had multiple individual therapists, her therapy had been terminated for poor attendance, and despite the additional three months that had elapsed while the six-month review hearing was continued, she had not made significant progress.  And the family had not yet begun family therapy, something the court concluded the three older children "desperately need[ed]" to address their feelings toward Mother and their sense that she did not love them.  The court held out the prospect, however, that there might be progress in family therapy before the section 366.26 hearing and that Mother could bring a petition to change the order.  (§ 388.)

## DISCUSSION

In general, when a child is removed from parental custody, the juvenile court must order reunification services.  (§ 361.5, subd. (a); *Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 843 (*Tonya M.*).)  The governing statutes set forth time limits for those services.  As pertinent here, when a sibling group is removed from parental custody, and one member of the group is under the age of three, reunification services may be limited to six months after the dispositional hearing, and "shall be provided for . . . no longer than 12 months from the date the child entered foster care."  (§ 361.5, subd. (a)(1)(B) & (C).)[4]  At the six-month hearing, the court may set a section 366.26 hearing within 120 days if it "finds by clear and convincing evidence

---

[4] The date a child entered foster care is deemed to be "the earlier of the date of the jurisdictional hearing . . . or the date that is 60 days after the date on which the child was initially removed from the physical custody of their parent or guardian."  (§ 361.49, subd. (a).)

8

that the parent failed to participate regularly and make substantive progress in a court-ordered treatment plan." (§ 366.21, subd. (e)(3).) If, however, the court finds there is a substantial probability the children may be returned to their parent within six months, or if reasonable services have not been provided, services may be offered until the 12-month hearing. (§§ 361.5, subd. (a)(1)(C), 366.21, subd. (e)(3).)

Mother contends the juvenile court's findings that she had not participated regularly and made substantive progress in her case plan and that there was no substantial probability the children could be returned to her by the 12-month hearing are not supported by the evidence.

We review the juvenile court's findings for substantial evidence, considering the evidence in favor on the prevailing party and resolving doubts in favor of the trial court's order. (*B.D. v. Superior Court* (2025) 110 Cal.App.5th 1132, 1150; *In re Yvonne W.* (2008) 165 Cal.App.4th 1394, 1401.) Where a finding must be based on clear and convincing evidence, the question is whether "the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 994–996.) Substantial evidence is "evidence that is reasonable, credible, and of solid value; it must actually be substantial proof of the essentials that the law requires in a particular case." (*Yvonne W.*, at p. 1401.) In our review for substantial evidence, " '[w]e do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.' " (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 689 (*Kevin R.*).)

Mother argues these standards are not met because she had made all the progress with her case plan that she could, in light of the injuries she had

9

suffered. For instance, she points out, she attended six sessions of a domestic violence support group and was engaged in the discussions. She attended two domestic violence programs, one five hours and the other four hours. She attended two six-session parenting classes, and she said she had learned about how children respond to their parents' actions, using incentives for good behavior, and the importance of structure and routine in children's lives. After participating in a domestic violence counseling session, she told a social worker she wanted to continue to focus on recognizing and regulating her emotions and that she appreciated the discussion with her counselor about boundaries and protecting herself. In December 2024, she told the social worker she was trying to be more firm with boundaries, and she said she could live without Father.

We bear in mind, though, that it is not our role to reweigh the evidence, but rather to determine if there are sufficient facts to support the juvenile court's findings, drawing all reasonable inferences in support of the court's order. (*Kevin R.*, *supra*, 191 Cal.App.4th at pp. 688–689.) In our view, the evidence is sufficient for the juvenile court to have found by clear and convincing evidence that Mother had not participated regularly and made substantive progress in her plan. Mother's case plan required her to complete a 26-week domestic violence class, which she did not do, instead completing two classes that totaled nine hours between them. Mother's failure to make more progress in the tasks related to domestic violence is particularly significant because domestic violence lay at the heart of this case. Mother and Father had a history of domestic violence that led to a previous dependency, one which ended less than four months before the incident giving rise to the current case. And in the current case, one of the children reported recently seeing Father " 'socking' " Mother in the face, and

10

the violence culminated a few days later when Mother ran into T.2's bedroom and asked her to barricade the door, then jumped out of the window to escape Father, who was " 'bust[ing] through' the door."

Even during this dependency, there was cause for concern that Mother remained in contact with Father, in violation of her case plan's requirement that she comply with the restraining order:  The children reported seeing pictures and text messages on her phone that suggested they were in contact, and family members told the social worker they had seen Father at Mother's home in January 2025.  The record fully supports a conclusion that Mother had not participated regularly and made substantive progress in the domestic violence portion of her case plan.

Mother's case plan also required to her enter and complete individual counseling.  Here, too, Mother had made some efforts, but they fell short in ways that allowed the court to conclude she had not participated regularly and made substantive progress in this regard, either.  Mother had completed some counseling, but the record indicates she started therapy three months after she told the social worker she had done so, that her first therapist terminated the therapy because of attendance violations, and that Mother misrepresented to the social worker the reason those sessions ended.  Mother reported churning through four different therapists between March and August 2025.  And in one program, where Mother stayed for 11 sessions, her engagement was reportedly "limited" and there was "minimal follow-through with assigned work."  Perhaps as a result, in the same conversation in which Mother informed the social worker she was working on "emotional intelligence," she also "erupted into an aggressive tirade toward [the] Social Worker, not once stopping to 'take a breath, take a pause,' nor 'not react to a negative thought' as she stated she was learning to do."

Mother was also inconsistent in her visits with the children, attending only approximately 60 percent of the available visits. She failed to confirm many of the visits ahead of time, failed to show up for some, and failed to stay the entire length of time for others. She even chose to go to Las Vegas to celebrate a birthday on the day of a scheduled visit, causing her to miss it. And when Mother's visits did occur, the social worker opined that the quality of the visits left considerable room for improvement.

Taking all these facts into account, the juvenile court could properly find by clear and convincing evidence that Mother had not participated regularly and made substantive progress in her case plan.

The evidence also supports the juvenile court's finding that there was no substantial probability the children could be returned to Mother's care by the time of the 12-month hearing. In considering the likelihood of reunification at a six-month hearing, the court considers not the likelihood during the six months after the hearing, but "the likelihood of reunification in such time as remains until a potential 12-month review hearing, even if less than six months." (*Tonya M.*, *supra*, 42 Cal.4th at p. 840.) That date was a mere two months off (see §§ 361.49, subd. (a), 366.21, subd. (f)(1)), and the trial court could reasonably find there was no substantial probability that Mother would sufficiently have addressed the problems that led to the children's removal during that brief period of time.

In reaching this conclusion, we recognize and do not discount the efforts that Mother *did* make. We also recognize that she faced physical limitations during her recovery from the injuries she sustained from jumping out of the window to escape Father. But in light of the record as a whole, including Mother's history of domestic violence with Father, her failure to meet the requirements of her case plan, and the indications that she

maintained contact with Father, the evidence supports the juvenile court's findings that she had not made substantive progress *and* there was no substantial probability the children could be returned to her care by the time of the 12-month hearing.

## DISPOSITION

The petition for extraordinary relief is denied on the merits. Our decision is final as to this court immediately. (Cal. Rules of Court, rules 8.490(b)(2)(A) & 8.452(i).) Mother's request for a stay of the December 1, 2025 hearing is denied.


TUCHER, P. J.


WE CONCUR:


PETROU, J.
RODRÍGUEZ, J.


*T.J. v. Superior Court* (A174042)

13